[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 108 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 109 
John J. "Jack" DeVenney and Shirley Ann DeVenney, husband and wife, sued Mason Hill, H. Frank Thomas III, David Eason, and Community Bank Trust ("the Bank"). The trial court entered a summary judgment in favor of Hill, Thomas, and the Bank on all the claims against them and a summary judgment in favor of the DeVenneys against Eason on all claims against him. The DeVenneys appeal the summary judgment entered in favor of Hill, Thomas, and the Bank. We affirm in part, reverse in part, and remand. *Page 110 
 I. Facts and Procedural History
The DeVenneys live in Wetumpka. They owned 33.7 acres of land, described in the deed as "original lots 294 and 295, East Wetumpka, Alabama" ("the land").
In 2002, Eason approached Mrs. DeVenney about buying the land for $205,000. Mrs. DeVenney refused his offer. Eason then offered Mrs. DeVenney $250,000. Mrs. DeVenney accepted the offer, provided that the DeVenneys would keep a 250-foot by 250-foot lot by the road ("the retained lot") and that Eason would excavate the retained lot for the DeVenneys. On April 8, 2002, Eason and Mrs. DeVenney entered into a "sales agreement," reflecting that Eason agreed to buy the land, excluding the retained lot, for $250,000 within 90 days; the sales agreement said nothing about the oral agreement to excavate the retained lot.
At some point when he was negotiating the sale of the land with Mrs. DeVenney, Eason approached Hill about financing his purchase of the land. Eason had borrowed money from Hill and Thomas for other business transactions. Eason and Hill eventually agreed that Hill and Thomas would purchase the land directly from the DeVenneys for $200,000[1] and that Eason would then buy the land from Hill and Thomas for $275,000.[2] Hill and Thomas considered themselves equal partners in this transaction, and both were experienced in real estate. Hill had purchased three houses and four commercial parcels. Thomas owns a real-estate brokerage firm and various properties. He has had a real-estate license since 1997 or 1998, has attended many real-estate closings, and has "looked at" more than 20 HUD-1 Settlement Statements.
Eason approached Mrs. DeVenney one or two days before the scheduled closing and offered her an additional $50,000 if she would allow him an extra month after the closing to pay $150,000 of the purchase price. Mrs. DeVenney agreed, and the total purchase price was thus orally increased to $300,000, $100,000 of which was due at the closing.
The closing was on April 19, 2002, at the office of the closing attorney, John Thornton. The DeVenneys met Hill and Thomas for the first time at the closing. Thornton's office and the Bank prepared all the closing documents. Hill and Thomas borrowed $202,350 from the Bank and out of that amount brought $200,000 to the closing. Eason brought to the closing two checks: one for $150,000 and the other for $50,000; both were postdated May 19, 2002.
The DeVenneys, Eason, Hill, Thomas, and Thornton were present during the closing. Thornton explained to all the parties that Hill[3] was actually buying the *Page 111 
land. The DeVenneys did not object. Mrs. DeVenney, however, insisted that the sales agreement she had entered into with Eason reflect that Eason was to excavate the retained lot. Thornton added the following handwritten clause at the bottom of the sales agreement: "David Eason agrees to excavate and level the 250 x 250 lot to a commercially feasible grade to the satisfaction of seller within 90 days." Eason and the DeVenneys signed below the clause. Thornton also added on the side of the sales agreement the following handwritten clause: "Contract assigned to Mason Hill." Eason signed at the bottom of this clause.
The HUD-1 Settlement Statement ("the HUD-1 statement") prepared for the closing reflected that Hill and Thomas were the borrowers and the DeVenneys were the sellers. It also presented the "Summary of Borrower's Transaction" on the left side as follows:
"Gross amount due from borrower
 "Contract sales price 250,000.00 ". . . .
 "Settlement charges to borrower 5,228.60 "Adjustments for liens paid by seller in advance
". . . .
"David Eason 97,121.40
 "Gross amount due from borrower 352,350.00 "Amounts paid by or in behalf of borrower
". . . .
 "Principal amount of new loan(s) 202,350.00 ". . . .
 "Earnest money paid by David Eason 150,000.00 ". . . .
 "Total paid by/for borrower 352,350.00 "Cash at settlement for or to borrower
"Gross amount due from borrower 352,350.00
"Less amounts paid by/for borrower 352,350.00
"Cash from borrower 0"
The HUD-1 statement reflected the "Summary of Seller's Transaction" on the right side as follows:
 "Gross amount due to seller
"Contract sales price 250,000.00 ". . . . "Gross amount due to seller 250,000.00 "Reductions in amount due to seller
". . . . "Earnest money paid by David Eason 150,000.00 ". . . . "Total reduction amount due seller 150,000.00 "Cash at settlement to or from seller
"Gross amount due to seller 250,000.00 "Less reduction amount due seller 150,000.00 "Cash to seller 100,000.00"
Thornton asked if everyone understood that Eason was receiving $97,121.40 from the closing although he was not a party, and all the parties agreed that they understood. Mrs. DeVenney did not ask that any changes be made to any documents to reflect that the total purchase price had been changed to $300,000. The DeVenneys, Hill, and Thomas signed the HUD-1 statement, and the DeVenneys executed a deed transferring the land to Hill.[4]
Thornton gave the DeVenneys a $100,000 check and showed everyone the two postdated checks in the amount of $150,000 and $50,000. Thornton also explained to the DeVenneys that the checks were not good that day, and Mrs. DeVenney acknowledged that she was depending on Eason to make the checks good. Thornton agreed to hold the checks until May 19, 2002, and the DeVenneys, Eason, and Thornton executed an agreement reflecting that Thornton would deliver the checks to the DeVenneys on May 19, 2002. Thornton made a copy of the checks for the DeVenneys.
The postdated checks to the DeVenneys were never honored. The DeVenneys sued Hill and Thomas, the Bank, and Eason. They alleged breach of contract against Hill and Thomas in Hill and Thomas's capacity as assignees of the contract; they asserted a vendor's lien against Hill and Thomas; and they sought specific performance *Page 112 
of the contract from Hill and Thomas. The DeVenneys asserted only a vendor's lien against the Bank. They stated that the Bank was a party because of its status as a mortgagee, and the DeVenneys sought to establish a vendor's lien superior to the Bank's mortgage lien.[5] The DeVenneys asserted against Eason various fraud claims, a vendor's lien claim, and the claims under § 6-5-101 et seq., Ala. Code 1975 (statutory deceit, fraud, and/or fraudulent suppression). Eason, Hill, Thomas, and the Bank answered. The DeVenneys eventually moved for a summary judgment on the vendor's lien claim against Eason, Hill, Thomas, and the Bank, or, in the alternative, on the breach-of-contract claim against Hill and Thomas, or, in the alternative, on the fraud and rescission-of-the-deed claims against Eason. Hill, Thomas, and the Bank moved for summary judgments as to all the claims against them.
The trial court entered a summary judgment in favor of the DeVenneys and against Eason on all the claims against Eason.[6] The trial court also entered a summary judgment against the DeVenneys and in favor of Hill, Thomas,[7] and the Bank[8] on all the claims the DeVenneys stated against Hill, Thomas, and the Bank.[9] The DeVenneys moved for the entry of a final judgment pursuant to Rule 54(b), Ala. R. Civ. P., as to Hill, Thomas, and the Bank, stating that the summary judgment did not adjudicate all of the claims; the DeVenneys pointed out that the summary judgment did not determine the amounts of the compensatory damages, punitive damages, and vendor's lien against Eason and Eason's interest in the land. The trial court entered the Rule 54(b) certification. The DeVenneys appeal the summary judgment entered in favor of Hill, Thomas,[10] and the Bank.
 II. Standard of Review
We review a summary judgment de novo. Mobile Airport Auth. v.HealthStrategies, Inc., 886 So.2d 773, 779 (Ala. 2004). In reviewing a summary judgment, this Court reviews the record in a light most favorable to the nonmovant. Id. If the movant makes a prima facie showing that there is no genuine issue of material *Page 113 
fact, then the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact.Id. Substantial evidence is evidence "`of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'" Id. Furthermore, we accord the trial court's legal conclusions no presumption of correctness. Id.
 III. Breach-of-Contract Claim Against Hill and Thomas
The DeVenneys argue that the trial court erred in failing to enter a summary judgment in their favor on their breach-of-contract claim against Hill and Thomas. The DeVenneys argue that Eason properly assigned the sales agreement to Hill, who was acting on behalf of the partnership composed of Hill and Thomas, and that Hill and Thomas failed to perform all the terms of the sales agreement. The DeVenneys argue that the $50,000 additional fee to hold the $150,000 check for a month after the closing and the agreement to excavate the retained lot were negotiated terms of the sales agreement. Thus, the DeVenneys argue, Hill and Thomas breached the contract by failing to perform all of the terms of the sales agreement and that they owe $200,000 for the unpaid purchase money and an additional $172,500 for the excavation of the retained lot, based on an estimate they had received on the work.
Hill and Thomas argue (1) that they never agreed to the assignment of the sales agreement, (2) that they fulfilled any obligation they had by bringing $200,000 to the closing, (3) that the Statute of Frauds, § 8-9-2(7), Ala. Code 1975, required that the agreement to pay an additional $50,000 be in writing and it was not, and (4) that the agreement to excavate the retained lot could not be assigned.
The DeVenneys did not present substantial evidence indicating that the $50,000 fee for allowing a late payment was part of the total purchase price represented by the assigned sales agreement. However, they did present substantial evidence indicating that Eason properly assigned to Hill and Thomas the sales agreement, which describes Eason's right to purchase the land and his obligation to excavate the retained lot. The DeVenneys also presented substantial evidence indicating that Hill and Thomas did not perform all of their duties under the assigned sales agreement.
 A. Assignment
Whether Hill and Thomas breached the sales agreement depends on whether Eason properly assigned the sales agreement to Hill and Thomas. There are no formal requirements for an assignment, and "an assignment may be written, parol, or otherwise." Baker v.Eufaula Concrete Co., 557 So.2d 1228, 1230 (Ala. 1990). The court must look to the substance of the assignment rather than to its form to determine whether there has been an assignment. Seeid. There has been an assignment (1) if the assignor intended to transfer a present interest in the subject matter of the contract, id., and (2) if the assignor and the assignee mutually assented to the assignment. See 6A C.J.S.Assignments § 73 (2004). An assignment is construed in accordance with the law of contracts. Dill v. Blakeney,568 So.2d 774, 778 (Ala. 1990).
Whether the assignor intended to transfer his or her interest is a factual issue to be determined under the circumstances of the case. Baker, 557 So.2d at 1230. In assigning an executory bilateral contract, the assignor delegates his or her duties to the assignee, unless the circumstances show a contrary intention, and the assignee impliedly promises to perform the *Page 114 
contract for the assignor. Meighan v. Watts Constr. Co.,475 So.2d 829, 834 (Ala. 1985) (stating that the "`assignee . . . in the absence of circumstances showing a contrary intention, becomes the delegatee of his assignor's duties and impliedly promises his assignor that he will perform such duties'" (quotingRose v. Vulcan Materials Co., 282 N.C. 643, 194 S.E.2d 521
(1973))).
Hill and Thomas insist that they did not sign an acknowledgment to the assignment clause in the sales agreement and that they did not see the sales agreement until the DeVenneys sued them. First, the law does not require that an assignee sign a written acknowledgment. See Baker, 557 So.2d at 1230 (holding that the assignment can be parol). The record shows that Hill and Thomas understood from Eason that they were purchasing the land from the DeVenneys. The DeVenneys presented evidence indicating that Hill and Thomas did not object when Thornton announced that Hill would be the one who actually purchased the land. Evidence shows that Hill and Thomas were in the room when Thornton wrote the assignment clause into the sales agreement and Eason signed below it. The DeVenneys also presented evidence indicating that Hill and Thomas jointly borrowed money from the Bank and that they brought $200,000 to the closing to buy the land from the DeVenneys. Hill and Thomas did not object when the DeVenneys signed the deed over to Hill. Even though Hill and Thomas did not acknowledge the assignment clause on the sales agreement by signing next to it, the DeVenneys presented substantial evidence of Hill and Thomas's agreement with Eason to buy the land, and their actions before and at the closing indicate that they intended to assume from Eason the rights and duties under the sales agreement to purchase the land from the DeVenneys.
Second, Hill, who had previously purchased at least seven residential and commercial properties, and Thomas, who has a real-estate license, undoubtedly had reviewed numerous HUD-1 Settlement Statements and had attended numerous real-estate closings. They would not have ignored the sales agreement and the HUD-1 statement that Thornton presented at the closing; however, even if they did not review either document, as purchasers and experienced businessmen in real estate, Hill and Thomas should have reviewed the documents. Therefore, they had constructive notice of the terms of the sales agreement. United Cos. Fin.Corp. v. Wyers, 518 So.2d 700, 704 (Ala. 1988) (holding that "[a] purchaser has constructive notice if the facts surrounding the transaction give notice, or are such that a reasonably prudent person would inquire further").
The DeVenneys presented substantial evidence indicating that Eason properly assigned the sales agreement to Hill and Thomas.[11] Thus, as assignees, Hill and Thomas were obligated to perform the terms of the assigned contract. SeeMeighan, 475 So.2d at 834.
 B. Terms of the Assigned Sales Agreement
Hill and Thomas argue that Eason told them that the purchase price *Page 115 
was $200,000, not $250,000. However, they had constructive notice of all the terms of the sales agreement and of the HUD-1 statement. At most, Hill and Thomas show a unilateral mistake with respect to a contract term. Restatement (Second) ofContracts § 154 (1981) provides:
"A party bears the risk of a mistake when
". . . .
 "(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
 "(c) the risk is allocated to him by the court on the ground that it is reasonable under the circumstances to do so."
In this case, Hill and Thomas bore the risk of the mistake. SeeHackney v. First Alabama Bank, 555 So.2d 97, 101 (Ala. 1989) (quoting Restatement (Second) of Contracts § 154). Hill and Thomas failed to review the closing documents, even though they were aware that they were the actual purchasers of the land. Although they acknowledge that they were aware that Eason and the DeVenneys were negotiating over the inclusion in the sales agreement of a provision addressing the excavation of the retained lot and that the checks from Eason that Thornton handed the DeVenneys at the closing were postdated, the record shows that they failed to inquire as to the impact of these transactions on their purchase of the land. Thus, the record shows that even if Hill and Thomas did not have actual knowledge of the terms of the sales agreement, they were comfortable with having limited knowledge. In light of the fact that Hill and Thomas were experienced in real-estate transactions, we believe that it is reasonable to allocate the risk of the mistake as to the purchase price to Hill and Thomas in this case.
With regard to the additional $50,000 Eason promised to pay the DeVenneys for the 30-day delay in making full payment of the purchase price, Hill and Thomas correctly point out that under the Statute of Frauds this agreement should have been in writing. The DeVenneys' agreement to lend or to forbear from collecting $150,000 for a sum of $50,000 must be in writing. § 8-9-2(7), Ala. Code 1975 (stating that "[e]very agreement or commitment to lend money, delay or forebear repayment thereof . . . except for consumer loans . . . less than $25,000" is to be in writing or the agreement is void).
The DeVenneys argue that the postdated checks of $150,000 and $50,000 sufficiently memorialize the terms of the agreement so as to satisfy the Statute of Frauds. We disagree. The checks are too indefinite to satisfy the Statute of Frauds with respect to Hill and Thomas's obligation because they fail to state the full terms of the agreement to forbear, the mutuality of the agreement, and the intention of the parties. Webster v. Aust, 628 So.2d 846,848 (Ala.Civ.App. 1993) (holding that a check does not satisfy the Statute of Frauds when it does not disclose the full terms of the contract, the specific dates of the closing, the payment of the balance, and the mutuality of the agreement and is not a final expression of the parties' agreement). Thus, the DeVenneys' agreement to forbear on collecting, or to lend $150,000, is void.[12] See § 8-9-2(7), Ala. Code *Page 116 
1975; Webster, 628 So.2d at 848-49. The purchase price stated in the sales agreement as assigned to Hill and Thomas did not include the additional fee of $50,000.
The DeVenneys did present substantial evidence indicating that the terms of the sales agreement, as assigned to Hill and Thomas, included excavating the retained lot. Mrs. DeVenney and Eason had agreed before the closing that the excavation of the retained lot would be an additional part of the purchase price. Mrs. DeVenney refused to proceed with the closing until the terms of the excavation were put in writing and made a part of the sales agreement. Thornton included the excavation clause in the sales agreement, and the clause was signed below by Eason and the DeVenneys.
Hill and Thomas argue that the excavation clause cannot be assigned because, they say, (1) it was a separate agreement between Eason and the DeVenneys and (2) the clause reflects that Eason would personally perform the service for the DeVenneys. First, the sales agreement denominates Eason as the "purchaser." The logical interpretation of Thornton's handwritten clause in the sales agreement is that Eason, as the purchaser, would perform the duty of excavating the retained lot. If Eason and the DeVenneys had intended to agree to the excavation of the retained lot separately from the sale of the land, then the clause would not have been included in the sales agreement. In fact, the separate agreement by Thornton to hold for 30 days two postdated checks from Eason to the DeVenneys was not reflected in the sales agreement; Thornton prepared a separate agreement that provided that Thornton would hold the two postdated checks and that Eason and the DeVenneys would not hold Thornton liable for holding them. Thus, the DeVenneys presented substantial evidence indicating that under these circumstances the entire sales agreement, including the excavation clause, was assigned to Hill, on behalf of the partnership composed of Hill and Thomas, and that, as assignees and partners, Hill and Thomas assumed all of Eason's duties.
Second, although certain personal-service contracts are not assignable, Sisco v. Empiregas, Inc. of Belle Mina,286 Ala. 72, 76, 237 So.2d 463, 466 (1970), such unassignable personal-service contracts relate to services that involve special skills, such as the painting of a portrait by an artist.Mitchell-Huntley Cotton Co. v. Waldrep, 377 F.Supp. 1215, 1222
(N.D.Ala. 1974). No such special skills are necessary to excavate the retained lot. In the context of the entire transaction for the sale of the land, the fact that the clause provided that "David Eason" would excavate the retained lot does not indicate that the parties intended for him personally to do so.
The DeVenneys presented substantial evidence indicating that the sales agreement was assigned to Hill and Thomas, as partners, and that the terms of the sales agreement included the purchase price of $250,000 and excavation of the retained lot.
 C. Breach of Contract
To show a breach of contract by Hill and Thomas, the DeVenneys must show "`(1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'"State Farm Fire Cas. Co. v. Slade, 747 So.2d 293, 303 *Page 117 
(Ala. 1999) (quoting Southern Med. Health Sys., Inc. v. Vaughn,669 So.2d 98, 99 (Ala. 1995)). The DeVenneys presented substantial evidence indicating that there is a valid contract between them and Hill and Thomas. The DeVenneys also presented substantial evidence indicating that they performed their part of the contract by conveying the land to Hill. The DeVenneys showed that Hill and Thomas did not fully perform under the terms of the sales agreement: they failed to excavate the retained lot and to pay $150,000 of the purchase price to the DeVenneys.
At the closing, Eason received $97,121.40, even though he was not a party to the transaction. Hill and Thomas argue that the DeVenneys transferred to Eason a portion of the $200,000 of purchase money that Hill and Thomas paid to the DeVenneys. The DeVenneys argue that the HUD-1 statement was prepared in advance of the closing by Eason, Hill, and Thomas and that Hill and Thomas must have intended to lend the money to Eason. The DeVenneys argue that they do not know the reason for the transfer and that they did not intend to convey to Eason any part of the purchase money.
As the DeVenneys point out, the HUD-1 statement does not reflect on the parallel side of the "Summary of Seller's Transaction," a deduction to Eason for the sum of $97,121.40 under the heading of "Adjustments for items paid by seller in advance." The transfer to Eason appears only as a line item under the "Summary of Borrower's Transaction." Thus, the HUD-1 statement reflects on the left side:
 "Summary of borrower's transaction:
". . . . "Adjustments for liens paid by seller in advance
"City/town taxes to "County taxes to "Assessments to "David Eason 97,121.40"
The HUD-1 statement reflects on the parallel right side:
 "Summary of seller's transaction:
". . . . "Adjustments for liens paid by seller in advance
"City/town taxes to "County taxes to "Assessments to"
The parties do not dispute that Eason's postdated check in the amount of $150,000 was part of the purchase price of the land. The seller's side of the HUD-1 statement shows:
 Cash paid at the closing $100,000 Earnest money paid by Eason + $150,000 ___________________________ ________ Total purchase price = $250,000
Thus, the HUD-1 statement appears to reflect that the transfer of $97,121.40 to Eason was from Hill and Thomas, and not from the DeVenneys.
Although Eason paid the remaining portion of the purchase price, $150,000, with a postdated check, Hill and Thomas, as assignees and purchasers, had a contractual duty to make sure that the payment was made good. See Meighan, 475 So.2d at 834
(holding that the assignee impliedly promises to perform the duties of the assigned contract). The DeVenneys presented substantial evidence tending to show that because Eason was no longer a party to the transaction, his payment must have been made on behalf of the purchasers, Hill and Thomas. The HUD-1 statement reflects that each amount deposited by the purchasers was "paid by or in behalf of borrower."
Thus, we conclude that the sales agreement was properly assigned to Hill and Thomas, as partners. We also conclude that the additional $50,000 fee for delaying collection of part of the purchase price was not a term of the sales agreement as assigned but that the excavation of the retained lot was a term of the assigned sales agreement. Therefore, the trial court erred in entering a summary judgment in favor of Hill and Thomas on the breach-of-contract claim brought against them in their status as assignees of the sales *Page 118 
agreement. We, therefore, reverse the summary judgment in favor of Hill and Thomas on the breach-of-contract claim, and we remand the case for further proceedings.
 IV. Vendor's Lien Claim Against Hill, Thomas, and the Bank
The DeVenneys argue that the trial court erred in failing to enter a summary judgment in their favor on the equitable claim of a vendor's lien against Hill, Thomas, and the Bank.[13] The DeVenneys argue that they have an equitable vendor's lien against Hill, Thomas, and the Bank because, they say, they transferred the land to Hill but did not receive the full purchase price. Hill, Thomas, and the Bank argue that the DeVenneys waived their equitable claim of a vendor's lien and that the trial court correctly entered a summary judgment in their favor. We agree that the DeVenneys waived their equitable claim to a vendor's lien, and we affirm the summary judgment in favor of Hill, Thomas, and the Bank on the vendor's lien claim.
There are three types of vendor's lien: (1) the grantor's implied lien where the law imposes a lien in favor of a vendor who has conveyed real property without taking any security for the payment of the purchase price; (2) the grantor's express lien where the grantor secured the lien by express contract; and (3) the grantor's retention of title where the vendor retains his title as security for the vendee to perform the contract.Wingard v. Randall, 269 Ala. 420, 424-25, 113 So.2d 674, 677-78
(1959). An implied vendor's lien arises if (1) there is a sale of real property and (2) unsecured purchase money remains unpaid.Meeks v. Meeks, 247 Ala. 606, 608, 25 So.2d 668, 669 (1946). In this case, the DeVenneys agreed to sell the land; they conveyed the deed to Hill; and Hill and Thomas did not fully pay the purchase price. Thus, the law could impose a vendor's lien. SeeBridgeport Land Improvement Co. v. American Fire-Proof SteelCar Co. of Alabama, 94 Ala. 592, 10 So. 704 (1892) (holding that the vendor's lien is a creature of equity and that the reason for attaching the lien is that it goes against good conscience for one person to keep another person's land without having paid the agreed consideration).
However, the implied vendor's lien may be waived, and the purchaser has the burden of showing any waiver of the implied vendor's lien. Lindsey v. Thornton, 234 Ala. 109, 173 So. 500
(1937). The lien may be waived (1) by the vendor's affirmative intention, Lindsey, (2) by reliance, not on land, but on a substituted, independent security, Armour Fertilizer Works v.Zills, 235 Ala. 41, 177 So. 136 (1937); Kinney v. Ensminger,94 Ala. 536, 10 So. 143 (1891), or (3) by reliance on the personal responsibility of the vendee, Armour; Kinney. The courts should look at all the facts and circumstances in a case to determine whether the vendor waived the lien. Armour.
In this case, Thornton explained at the closing that the postdated check of $150,000 was not good at that time. Mrs. DeVenney testified at her deposition that she told Thornton that she understood that she was looking to Eason to make the $150,000 check good. Further, Mrs. DeVenney understood that the DeVenneys were essentially financing $150,000 for 30 days after the closing. Thus, facts and circumstances indicate that Mrs. DeVenney *Page 119 
was relying on the personal responsibility of Eason, who was paying on behalf of Hill and Thomas, for the rest of the purchase money. The appearance of reliance on personal responsibility creates a rebuttable presumption of waiver. Walker v. Carroll,65 Ala. 61 (1880). See also, Lindsey, supra (holding that the giving of other security creates a prima facie presumption of waiver, but that the presumption may be rebutted). The DeVenneys have not shown any facts to rebut the presumption that they were relying upon Eason's personal responsibility for the unpaid portion of the purchase price.
In Fowler v. Falkner, 199 Ala. 6, 73 So. 980 (1917) (holding that where the vendor was induced by the vendee to accept third-party notes as part of the purchase price, the vendor did not waive the lien where the notes were not of the agreed-upon value, and the vendee had fraudulently misrepresented the value of the notes), and Madden v. Barnes, 45 Wis. 135 (1878) (holding that the vendor did not waive the lien where a check was refused for insufficient funds by the vendee's bank; the vendee's check was fraudulent because the presentment of a check presupposes that there are sufficient funds in the bank account), the recipients of the payments had no reason to believe that the respective notes and check were not good. The DeVenneys, on the other hand, knew at the time of the closing that the $150,000 check was not good. The DeVenneys understood that they were essentially making a $150,000 loan for 30 days and that they were relying on the personal responsibility of Eason to make good the payment. Under these circumstances, we find that the DeVenneys waived their implied vendor's lien against Hill, Thomas, and the Bank.[14]
 V. Conclusion
We conclude that the trial court erred in entering a summary judgment in favor of Hill and Thomas on the breach-of-contract claim. The summary judgment on the breach-of-contract claim against Hill and Thomas as assignees of the sales agreement is reversed, and we remand for further proceedings consistent with this opinion. We affirm the summary judgment in favor of Hill, Thomas, and the Bank on the implied vendor's lien claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] Eason and Mrs. DeVenney agreed to a purchase price of $250,000, but Eason apparently told Hill and Thomas that the purchase price would be $200,000.
[2] Eason and Hill executed a contract reflecting this agreement at the closing of the purchase of the land.
[3] Hill and Thomas do not dispute that they acted as partners in the transaction. Although only Hill was named in the deed, Hill and Thomas considered themselves to be joint buyers of the land. Hill and Thomas jointly obtained a loan from the Bank for this transaction. Hill was acting in this case on behalf of the Hill and Thomas partnership. See § 10-8A-204(c), Ala. Code 1975 (providing that property is presumed to be partnership property if partnership assets were used to acquire the property). Hill's actions were for the benefit of the partnership between Hill and Thomas. See § 10-8A-301(1), Ala. Code 1975 (providing that each partner is an agent of the partnership and that a partner's actions on behalf of the partnership bind the partnership).
[4] Other closing documents included the "Seller's Affidavit and Indemnity," Hill and Thomas's mortgage to the Bank, Hill and Thomas's promissory note in favor of the Bank, and Hill and Thomas's credit application to the Bank.
[5] The claims in the complaint, as amended, are: (1) fraud in the inducement (against Eason); (2) promissory fraud (against Eason); (3) fraud in the inducement (alleging facts different from those in the first count) (against Eason); (4) fraudulent suppression (against Eason); (5) promissory fraud (alleging facts different from those in the second count) (against Eason); (6) vendor's lien (against Eason, Hill, Thomas, and the Bank); (7) claims under § 6-5-101 et seq., Ala. Code 1975, alleging that the deed should be rescinded because it was based on fraud (against Eason); (8) breach of contract against the assignees of contract (against Hill and Thomas); and (9) specific performance (against Hill and Thomas).
[6] The claims against Eason are claims 1 through 7 of the complaint. See note 5.
[7] The claims against Hill and Thomas are claims 6, 8, and 9 of the complaint. See note 5.
[8] Claim 6 of the complaint was the only claim against the Bank. See note 5.
[9] The trial court later entered an amended order in favor of Hill, Thomas and the Bank to correct the omission of the word "no" in front of the phrase "genuine issue of material fact."
[10] The trial court entered a summary judgment in favor of Hill and Thomas on all claims, including the specific performance claim; however, we note that the DeVenneys appeal only the trial court's disposition of (1) the breach-of-contract claim and (2) the vendor's lien claim. Thus, we address the merits of the summary judgment against Hill and Thomas with respect only to the breach-of-contract and vendor's lien claims.
[11] We note that Hill and Thomas argue that the sales agreement was never assigned and that they should not have to perform the terms of the agreement; yet, under the scenario they present, they would retain the land and reap the benefits of the agreement. A party cannot reap the benefits of a contract, yet seek to avoid the burdens of performing his obligations under the terms of the contract. Fairford Lumber Co. v. Tombigbee ValleyR.R., 165 Ala. 275, 290, 51 So. 770, 774 (1910) (holding that "[o]ne who elects to avoid the burdens of a contract will not be allowed to reap the benefits thereof").
[12] Even if we consider the agreement to pay an extra $50,000 in return for forbearance to be a modification of the sales agreement, that modification must be in writing and signed by the charged party. Charles J. Arndt, Inc. v. City of Birmingham,547 So.2d 397, 401 (Ala. 1989) (stating the general rule that "any contract required by the Statute of Frauds to be in writing cannot be modified by subsequent oral agreement"; the modification must be in writing and signed by the charged party).
[13] The DeVenneys obtained a summary judgment against Eason on all claims, including the vendor's lien claim. Whether that summary judgment against Eason was properly entered is not before us; therefore, we express no opinion on that question.
[14] The DeVenneys' personal reliance on Eason to later fund a portion of the purchase price on behalf of Hill and Thomas waived the implied vendor's lien, but regardless of on whom the DeVenneys relied to fund a portion of the purchase price, Hill and Thomas as assignees and purchasers were ultimately responsible to pay all of the purchase price. See Meighan,475 So.2d at 834.